UNITED STATES of America, Plaintiff,

v.

STATE OF LOUISIANA; Walter Fox McKeithen in his official capacity as the Secretary of State of Louisiana; Richard R. Ieyoub in his official capacity as the Attorney General of Louisiana; City of Shreveport; Shreveport City Court; Robert W. Williams in his official capacity as Mayor of the City of Shreveport; Virginia Hester in her official capacity as the Clerk of Shreveport City Court; Ernest Roberson in his official capacity as the Registrar of Voters of Caddo Parish, Louisiana; and William T. Johnston in his official capacity as the Registrar of Voters of Bossier Parish, Louisiana, Defendants.

No. 96–1903.

United States District Court,
W.D. Louisiana.

Jan. 24, 1997.

William J. Flanagan, U.S. Attorney's Office, Shreveport, LA, Michael D. Skinner, U.S. Attorney's Office, Lafayette, LA, Elizabeth Johnson, Donna M. Murphy, Judybeth Greene, Timothy F. Mellett, U.S. Dept. of Justice, Washington, DC, Deval L. Patrick, Dept. of Justice Civil Rights Div., Washington, DC, for U.S.

Roy A. Mongrue, Jr., Angie R. LaPlace, LA Atty. General's Office, Baton Rouge, LA, Beth Conrad Langston, 2nd Circuit Court of Appeal, Shreveport, LA, for State of Louisiana, Walter Fox McKeithen, Richard R. Ieyoub, Ernest Roberson, William T. Johnston.

Robert G. Pugh, Pugh Pugh & Pugh, Shreveport, LA, for City of Shreveport, City Court of Shreveport, Robert W. Williams, Virginia Hester.

Before STEWART, Circuit Judge, and LITTLE and DOHERTY, District Judges.

STEWART, Circuit Judge:

We are convened pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2284 to perform a narrowly defined task—determine whether the City of Shreveport, Louisiana (City) and the State of Louisiana (State) have properly complied with the preclearance requirements of Section 5 of the Voting Rights Act of 1965. The United States asks us to issue a preliminary injunction that would prevent two elected incumbent candidates for Divisions A and B of the City Court of Shreveport from receiving their commissions to serve another six-year term. Specifically, the United States claims that the geographical jurisdiction of the City Court had been enlarged pursuant to annexations which had not been precleared in accordance with § 5 of the Voting Rights Act.

The City has also filed three motions with this Court. First, the City has moved to dismiss this case for lack of subject matter jurisdiction. Second, the City claims that the United States has failed to state a claim for which relief could be granted. Specifically, the City claims that the Voting Rights Act of 1965 is unconstitutional. Third, the City seeks an order compelling the United States to respond to various discovery requests for information concerning the Attorney General's decision to deny preclearance for the City Court annexations.

Because we found that the United States had met the requirements for issuing a preliminary injunction, we issued an injunction on December 20, 1996 compelling the State and the City to seek a declaratory judgment in the District Court for the District of Columbia. In the meantime, the elected judges shall holdover in their offices, without new six-year commissions, until the City and State obtain judicial preclearance for the City Court annexations. We denied the City's three motions because we did not have jurisdiction to hear the claims asserted in the motions.

We write today to amplify our reasons for granting the injunction and denying the City's motions.

## FACTS

Our story begins in 1976, when the City submitted for review to the Attorney General annexations affecting the City. In its submission, the City did not specifically state that it was seeking preclearance for any particular political office within the City. United States' Post–Hearing Brief, Exh. A. In 1978, the City sought preclearance for more annexations and the City Charter of the City. In the 1978 letter, the City made reference to the City Council and the Mayor in its discussion of the City Charter. *Id.* The City did not mention the effect of the annexations on the Shreveport City Court. In response to the City's request, the Justice Department understood the City's submission as follows:

This is in reference to 14 annexations adopted between November 1, 1964 and January 1, 1966; 16 annexations adopted between January 27, 1976 and February 14, 1978; Resolution No. 546 of 1976 (August 24, 1976), creating the City Government Committee; the adoption of a strong mayor form of government, with a seven-member city council with members elected from single-member districts, and the boundaries of those districts; and a special election to be held May 13, 1978; submitted by the City of Shreveport to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965.

Letter from Assistant Attorney General Drew S. Days III to John Gallagher, Legal Department, City of Shreveport, May 12, 1978. Based on this understanding, the Attorney General precleared the requested annexations and the City Charter, although the Attorney General reserved his right to pursue "subsequent judicial action to enjoin the enforcement of such changes." *Id.*[1] Both parties agree that this letter indicated that the Attorney General precleared (1) the an-

---

1. *See* 28 C.F.R. § 51.15(a) (1996) ("[T]he failure of the Attorney General to interpose an objection does not exempt from the preclearance requirement the implementation of the particular voting change that is enabled, permitted, or required, *unless that implementation is explicitly included and described in the submission of such parent legislation.*" (emphasis added)). We shall have more to say about the principle embodied in this regulation (specificity) later. *See infra* Discussion, Part II.B.

nexations as they affected the City Council elections and (2) the City Charter.

From what we gather from the record before us, it was not until 1989 that the Justice Department discovered that the elections to the Shreveport City Court included the annexed territories the Justice Department had earlier precleared for the Shreveport City Council. On January 3, 1989, the State, on behalf of the City, submitted for review Act No. 15 (1970), which created a third judicial position for the Shreveport City Court (Division C). On July 17, 1989, the State submitted for § 5 review Louisiana Act No. 6 (1968), which provided for the expansion of the boundaries of the Shreveport City Court to include annexations to the corporate limits of Shreveport. At that point, the Attorney General was unable to make a determination regarding the submitted voting changes because numerous annexations to the City Court's jurisdiction had not been submitted. The Justice Department requested and was provided additional information about the proposed change. In a September 1989 letter, the Justice Department stated:

> We understand that there have been several annexations to the Shreveport City Court, pursuant to Act No. 6 (1968). Our records fail to show that these changes have been submitted to the United States District Court for the District of Columbia for judicial review or to the Attorney General for administrative review as required by Section 5. If our information is correct, it is necessary that these changes either be brought before the District Court for the District of Columbia or submitted to the Attorney General for a determination that the changes do not have the purpose and will not have the effect of discriminating on account of race or color.

On July 21, 1992, the State, on behalf of the City, submitted for § 5 review Louisiana Act No. 501 (1992), which created a fourth City Court judicial position (Division D). Act No. 501 also provided for a change in the City Court method of election from at-large to one multimember and one single-member district. The Attorney General was again unable to make a determination regarding the submitted voting changes because nu-

merous annexations to the City Court's jurisdiction had not been submitted. On September 18, 1992, the Attorney General informed the City that no determination was possible and requested once more that the unprecleared annexations be submitted for § 5 review.

On April 5, 1993, the City submitted for § 5 review 321 annexations to the boundaries and jurisdiction of the City Court that had been implemented between 1967 and 1992. On June 4, 1993, the Attorney General requested that the City send additional information so that a determination could be made. On June 21, 1994, the City submitted six more annexations that expanded the City Court's boundaries and jurisdiction. At the same time, Louisiana Acts No. 6 (1968), No. 15 (1970), and No. 501 (1992) were resubmitted for review. On July 6, 1994, the City submitted the additional information necessary to complete the submission of all of these voting changes.

In 1994, the parties came to loggerheads. On September 6, 1994, the Attorney General interposed a timely objection under § 5 to the submitted annexations to the City Court boundaries and to the voting changes caused by Acts No. 6, No. 15, and No. 501. The objection letter stated that the proposed changes effectuated an eleven percentage-point decrease in black voting strength. United States' Orig. Complaint, Exh. A. The letter asked that the State inform officials of the United States Justice Department of its plans for the City Court elections. *Id.*

The State then did an about-face. In a September 16, 1994 letter from the Assistant Attorney General of Louisiana, the State, *for the first time*, argued that § 5 preclearance of the annexations to the City Court was unnecessary because the Attorney General had previously precleared annexations for the City Council elections. State of Louisiana's Orig.Brief, Exh. 1. Therefore, argued the State, elections for Divisions A and B of the City Court could be held using boundaries that included the annexations. On December 11, 1995, the State also requested that the Attorney General reconsider the objections to the judicial positions created in 1970 and 1992 and to the new election system

of one single-member district and one multi-member district.

On February 9, 1996, the Attorney General denied the State's request for reconsideration and refused to withdraw the September 6, 1994 objections, including the objection to annexations expanding the City Court boundaries for Divisions A and B. The Attorney General also informed the State and the City that preclearance of annexations to the boundaries used for the Shreveport City Council elections did not serve as preclearance for the City Court elections. The letter explained that until the § 5 objection is withdrawn or a declaratory judgment from the District Court for the District of Columbia is obtained, "the objection by the Attorney General remains in effect and the proposed changes continue to be legally unenforceable." United States Orig.Complaint, Exh. B. The letter again asked the State to inform officials of the Justice Department of its plans for the City Court elections. Id.

On May 22, 1996, an attorney in the Voting Section of the Justice Department wrote to the State's attorney general requesting information about the 1996 elections for the Shreveport City Court. The letter restated that the Attorney General's objections to the annexations affecting the City Court remained in effect until the objections were withdrawn or a declaratory judgment was obtained. The State was informed by the Justice Department that under § 5, "elections for the Division A and Division B judges may only proceed in the pre-annexation territory which was included within the City Court boundaries as of November 1, 1964." United States Orig.Complaint, Exh. C.

On June 26, 1996, the State's Assistant Attorney General confirmed to the Louisiana Secretary of State in a letter that "our position has been and remains that no such preclearance ... is required." United States' Orig.Complaint, Exh. D.[2] The letter further asserted that "elections for divisions A and B, which have been precleared, unlike Divisions C and D, can be conducted this fall

using the precleared city annexations for the voting boundaries." Id.

Despite the City's and State's failure to obtain administrative or judicial preclearance for the annexations affecting the Shreveport City Court elections, the City proceeded with candidate qualifying. Believing that an election would take place in violation of the Voting Rights Act, the United States filed a complaint seeking to enjoin the City Court elections until proper § 5 preclearance had been obtained. As it turned out, however, the two judges seeking office in Districts A and B were unopposed and deemed elected under Louisiana election law. La.R.S. 18:511(B) (West 1996). The United States thereafter amended its complaint, recognizing that the issues raised by their original request for injunctive relief had become moot (i.e., there was no election to enjoin).

In the amended motion for a preliminary injunction—the subject of this opinion—the United States seeks to prevent the "elected" judges from Districts A and B of the City Court from receiving their commissions to take office for another six-year term. The United States can prevail only if it demonstrates that (1) the 300–plus annexations affecting the Shreveport City Court elections are considered "changes" subject to § 5's preclearance requirement, (2) the annexations were not precleared by the Attorney General, and (3) an injunction is the proper remedy for the § 5 violation. Lopez v. Monterey County, —— U.S. ——, ——, 117 S.Ct. 340, 349, 136 L.Ed.2d 273 (1996). We conclude that the United States has made a sufficient showing that an injunction should issue.

## DISCUSSION

### I. A Brief Primer on Section 5 of the Voting Rights Act of 1965

Faced with election practices in various States that ostensibly denied racial minorities the right to vote, Congress in 1965 enacted the Voting Rights Act in the hopes of putting an end to what Congress perceived

**2.** Of course, the State's "position" emerged in 1994, after a failed attempt at administrative preclearance and five years after the State first

learned that the Attorney General required preclearance for the annexations as they affected the Shreveport City Court elections.

as "an insidious and pervasive evil ... perpetuated in certain parts of the country through unremitting and ingenious defiance of the Constitution." *South Carolina v. Katzenbach*, 383 U.S. 301, 309, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). Prior to the enactment of the 1965 Act, Congress had enacted a series of statutes that aimed to eliminate, on a case-by-case basis, the problem of race discrimination in voting. *Id.* at 313, 86 S.Ct. at 810–11. These efforts failed, however. Litigation was slow, favorable court decrees were circumvented with new practices that discriminated against racial minorities, and local officials outright defied court orders. *Id.* at 314, 86 S.Ct. at 811.

■ Congress's frustrations with recalcitrant state and local officials found its most potent expression in § 5 of the Voting Rights Act of 1965. Viewed as perhaps the most important section of the Act,[3] § 5 "prescribes remedies for voting discrimination which go into effect without any need for prior adjudication." *Katzenbach*, 383 U.S. at 327–28, 86 S.Ct. at 818. Failure to satisfy § 5's requirements results in federal nullification of the election results. *Clark v. Roemer*, 500 U.S. 646, 652, 111 S.Ct. 2096, 2100–01, 114 L.Ed.2d 691 (1991); *Hathorn v. Lovorn*, 457 U.S. 255, 269, 102 S.Ct. 2421, 2430, 72 L.Ed.2d 824 (1982). The justification for this expedited method of ferreting out racially discriminatory voting practices and the draconian penalty for noncompliance is well-known: "Congress had found that case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits." *Id.* at 328, 86 S.Ct. at 818. As such, the advantages of "time and inertia" were given to the victims and the burden of eliminating discriminatory practices fell onto the "perpetrators of the evil."

*Id.* That burden weighs heaviest in § 5's so-called preclearance requirement.

The procedures for seeking § 5 preclearance are well-established, and we review them here to provide a framework for our analysis.[4] A political subdivision covered by § 5, which "enact[s] or seek[s] to administer any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting different from that in force or effect on November 1, 1964," 42 U.S.C. § 1973c, has to satisfy § 5's procedural and substantive preclearance requirements.

Procedurally, a submitting jurisdiction has two choices. On the one hand, the jurisdiction may seek administrative preclearance from the Attorney General. 42 U.S.C. § 1973c; 28 C.F.R. § 51.10(b) (1996). Under this option, the submitting jurisdiction may obtain preclearance in a relatively short period of time because the Attorney General has 60 days within which to interpose an objection to the changes in election practices. *See, e.g.*, 28 C.F.R. § 51.41(a) (1996). Alternatively, the jurisdiction may obtain judicial preclearance, namely, a declaratory judgment from the District Court for the District of Columbia. 42 U.S.C. § 1973c; 28 C.F.R. § 51.10(a) (1996).

■ Substantively, administrative and judicial preclearance require the submitting jurisdiction to demonstrate that the proposed changes in voting do not have the purpose or effect "of denying or abridging the right to vote on account or race or color...." 42 U.S.C. § 1973c; 28 C.F.R. § 51.10(a); *McCain v. Lybrand*, 465 U.S. 236, 256, 104 S.Ct. 1037, 1049, 79 L.Ed.2d 271 (1984). Put simply, the submitting jurisdiction must prove that the voting change does not have a retrogressive effect. *See Holder v. Hall*, 512 U.S. 874, 883, 114 S.Ct. 2581, 2587, 129 L.Ed.2d 687 (1994) (plurality opinion).

---

3. *See* Scott Gluck, *Congressional Reaction to Judicial Construction of Section 5 of the Voting Rights Act of 1965*, 29 Colum.J.L. & Soc.Probs. 337, 340 (1996) (arguing that § 5 "eventually became the single most important provision of the Voting Rights Act and the key to preventing electoral discrimination against Blacks").

4. For an excellent overview of the § 5 preclearance procedures as well as a collection of the case law, see M. David Gelfand, Constitutional Litigation Under Section 1983: A Treatise for City Attorneys, Public Interest Litigators, and Students § 1–4(B)(2) (Michie 1996).

■ Administrative and judicial preclearance are independent of one another. If a jurisdiction seeks, but is denied, administrative preclearance from the Attorney General, the submitting jurisdiction may seek a declaratory judgment in the District Court for the District of Columbia.[5] In the same way, if judicial preclearance is denied, the submitting jurisdiction is free to seek administrative preclearance from the Attorney General. If the submitting jurisdiction obtains administrative or judicial preclearance, private parties remain free to challenge the constitutionality of the voting change in traditional suits, but not under the rubric of § 5. *See Morris v. Gressette,* 432 U.S. 491, 502–03, 97 S.Ct. 2411, 2419–20, 53 L.Ed.2d 506 (1977); 42 U.S.C. § 1973c.

With these basic principles in mind, we proceed to the contentions of the parties to determine whether the United States is entitled to injunctive relief.

## II. The Scope of our Jurisdiction

We must first address the scope of our jurisdiction because the City and State have made arguments that would expand the jurisdiction of this three-judge court beyond that which other similarly situated panels have recognized. First, the City argues that we may review the merits of the Attorney General's decision denying preclearance for the City Court annexations. Specifically, the City has presented us with a wealth of evidence which allegedly proves that the minority vote within the City has not been diluted by the City's 300–plus annexations. Second, the City and State argue (and the

United States has apparently agreed) that the United States must satisfy the traditional requirements for obtaining a preliminary injunction. We address each of these contentions in turn.

### A. The Attorney General's Retrogression Determination

In 1994, the Attorney General interposed timely objections to the effect the City's annexations had on the City Court elections. The Attorney General informed the City that the City Court annexations had the effect of diluting the minority vote within Districts A and B. The City now argues that the United States' request for a preliminary injunction should be denied because the Attorney General erred when it concluded that the annexations had a discriminatory effect. To prove this claim, the City has moved to compel discovery of documents from the Attorney General regarding the Attorney General's retrogression determination.

■ We reject the City's contention because we do not have jurisdiction to hear the claim. This three-judge panel was convened pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2284,[6] and we clearly have subject matter jurisdiction to hear this case.[7] It is well-settled that the jurisdiction of this court is limited to three discrete avenues of inquiry: "(i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate." *City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3,

5. The three-judge district court is not bound by the findings of the Attorney General. *See Bossier Parish Sch. Bd. v. Reno,* 907 F.Supp. 434, 443 (D.D.C.1995) (three-judge court) (authorities cited therein), *probable jurisdiction noted,* —— U.S. ——, 116 S.Ct. 1874, 135 L.Ed.2d 171 (1996). Oral argument in *Bossier Parish* was held on December 9, 1996.

6. Section 1973c provides in part that any action taken under § 5 of the Voting Rights Act "shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code...." This panel was convened pursuant to § 2284(b)(1), which provides in part:
Upon the filing of a request for three judges, the judge to whom the request is presented

shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. The judges so designated, and the judge to whom the request was presented shall serve as members of the court to hear and determine the action or proceeding.

7. For this reason, we denied the City's motion to dismiss for lack of subject matter jurisdiction. In addition, the City's discovery motion was filed *after* we issued the Order in this case. Based on our limited jurisdiction and the fact that the Order already had been filed, we denied the City's discovery motion as moot.

103 S.Ct. 998, 1001 n. 3, 74 L.Ed.2d 863 (1983). In *Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), for example, the Supreme Court held that it was reversible error for a three-judge court like this one to decide whether the challenged state actions had " 'a discriminatory purpose or effect.' " *Id.* at 385, 91 S.Ct. at 435 (quoting the three-judge panel opinion). The *Perkins* Court reasoned as follows:

> What is foreclosed to such [a three-judge] district court is what Congress expressly reserved for consideration by the District Court for the District of Columbia or the Attorney General—the determination whether a covered change does or does not have the purpose or effect "of denying or abridging the right to vote on account of race or color."

*Id.* (quoting 42 U.S.C. § 1973c).

It is plain that the City has asked us to decide an issue over which we have no jurisdiction. Indeed, if we were to address the City's claim that the Attorney General's retrogression determination was incorrect, we would plainly be committing reversible error. *Perkins,* 400 U.S. at 385, 91 S.Ct. at 435. This we decline to do.

■ For these same reasons, we denied the City's motion to dismiss for failure to state a claim upon which relief could be granted because we do not have jurisdiction to hear the City's claim that the Voting Rights Act of 1965 is unconstitutional. Our narrow jurisdictional mandate plainly precludes us from determining the constitutionality of the Act that breathes jurisdictional life into this three-judge court.

**8.** The Fifth Circuit has held that "[a] party must establish the existence of four requirements before a court can grant preliminary injunctive relief: (1) a substantial likelihood that a plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Rodriguez v. United States,* 66 F.3d 95, 97 (5th Cir.1995) (per curiam), *cert. denied,* —— U.S. ——, 116 S.Ct. 1058, 134 L.Ed.2d 202 (1996).

**9.** We certainly do *not* hold that balancing the harms that may flow from an injunction and considering the public interest are irrelevant to

*B. The Traditional Requirements for Issuing a Preliminary Injunction*

We next turn to the question of whether the United States must meet the traditional four requirements for issuing a preliminary injunction.[8] In its briefs and during the hearing on this matter, the City and State argued strenuously that the United States has failed to demonstrate a substantial likelihood of success on the merits and failed to show that it would suffer irreparable harm if an injunction does not issue. The United States asserts that it has made such a showing. To further clarify the parties' positions on these two issues, we ordered the parties to file post-hearing briefs that discussed (1) whether the United States would suffer irreparable harm if an injunction did not issue, and (2) whether the United States had a substantial likelihood of success on the merits. Both sides timely filed briefs addressing these two issues.

■ On fresh consideration of the subject, we hold that our limited jurisdictional scope precludes us from applying the traditional four-part test when determining whether a preliminary injunction should issue in the first instance.[9] The case law and three independent justifications compel this conclusion.

We have reviewed the numerous cases in which a three-judge panel was convened pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2284, and we have found no persuasive authority for the proposition that the traditional preliminary injunction test applies to claims for injunctive relief in the face of a § 5 preclearance violation.[10] Rather, three-

fashioning an appropriate § 5 injunctive remedy. We simply hold that the ex ante question of whether an injunction should issue is not dependent upon satisfying the traditional test.

**10.** The Supreme Court's decision in *Lucas v. Townsend,* 486 U.S. 1301, 108 S.Ct. 1763, 100 L.Ed.2d 589 (1988) (Kennedy, J., in chambers)— which looked to whether the plaintiffs had suffered irreparable harm and balanced the interests at stake—is not to the contrary. There, the plaintiffs sought an injunction from Justice Kennedy through the unique in-chambers procedure established by the Supreme Court. The Court has well-developed rules for when equitable relief in the form of an injunction is to be granted

judge courts like this one have engaged in the three-part inquiry we have outlined above, namely, whether a voting change is

by a Justice of the Supreme Court. The Justice considers, among other things, whether there has been a showing of irreparable harm, and in the "appropriate cases, ... balance[s] the equities to determine whether the injury asserted by the applicant outweighs the harm to other parties or to the public." *Id.* at 1304, 108 S.Ct. at 1764. Clearly, *Townsend*'s discussion of irreparable harm and balancing of interests has no application to the unique procedure Congress has set forth in § 5 of the Voting Rights Act.

We have also found two decisions from three-judge panels that have stated the traditional preliminary injunction test applies in a § 5 preclearance case. However, neither decision persuades us that the traditional test should apply here. In *United Ossining Party v. Hayduk*, 357 F.Supp. 962 (S.D.N.Y.1971), the plaintiffs sought to enjoin the enforcement of a statute they claimed violated, among other things, § 5 of the Voting Rights Act. In evaluating their claim for injunctive relief, the court stated that they were "guided by the basic principle that preliminary injunctive relief may be granted only upon a showing of likelihood of success on the merits and the existence or threat of irreparable injury." *Id.* at 966. However, the court never again mentioned the traditional rule, and more importantly, did not even apply it. Instead, the three-judge court recognized its limited jurisdictional scope and confined its analysis to a determination of whether the challenged legislation was a covered voting change, and if so, whether it was precleared. *Id.* The court concluded that the plaintiffs had satisfied both criteria: "Since it is undisputed that Chapter 1179 has not been cleared through a declaratory judgment action in the District of Columbia or by submission to the Attorney General of the United States, its enforcement *must* be stayed." *Id.* (emphasis added). Accordingly, *United Ossining Party* is not inconsistent with the conclusion we have reached in this case.

The same, however, cannot be said for the three-judge panel's decision in *Merced v. Koch*, 574 F.Supp. 498 (S.D.N.Y.1983) (three-judge court). There, the court declined to issue an injunction because the plaintiffs had failed to meet the traditional four-part test for issuing a preliminary injunction. Although it is not clear from the decision whether the three-judge panel in *Merced* was convened pursuant to 42 U.S.C. § 1973c and 22 U.S.C. § 2284, to the extent the *Merced* panel is similar to ours, we decline to follow that decision for three reasons. First, the court failed to acknowledge the limited jurisdictional scope of its three-judge panel. Second, and most importantly, the court failed to determine whether the challenged procedures were covered voting changes and if so, whether those changes had been precleared. The court's failure to do so runs afoul of the Supreme Court's repeated admonition that three-judge panels

covered by § 5, whether that change has been precleared by the Attorney General or the District Court for the District of Columbia, and if not, what remedy is appropriate.[11]

have a narrowly defined task. *See Lopez v. Monterey County*, ─── U.S. at ───, 117 S.Ct. at 349; *NAACP v. Hampton County Election Comm'n*, 470 U.S. at 166, 105 S.Ct. at 1128–29. And third, the traditional analysis used by the *Merced* court is an anomaly; no other published decision, as far as we are aware, has applied the traditional preliminary injunction test to claims like those made in this case.

11. *See also Lopez v. Monterey County*, ─── U.S. at ───, 117 S.Ct. at 349; *NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 181, 105 S.Ct. 1128, 1136–37, 84 L.Ed.2d 124 (1985); *McCain v. Lybrand*, 465 U.S. at 250 n. 17, 104 S.Ct. at 1046 n. 17; *Dougherty County, Ga., Bd. of Educ. v. White*, 439 U.S. 32, 36, 99 S.Ct. 368, 371, 58 L.Ed.2d 269 (1978); *United States v. Board of Supervisors*, 429 U.S. 642, 645–47, 97 S.Ct. 833, 834–35, 51 L.Ed.2d 106 (1977) (per curiam); *Connor v. Waller*, 421 U.S. 656, 656, 95 S.Ct. 2003, 2003, 44 L.Ed.2d 486 (1975) (per curiam); *Georgia v. United States*, 411 U.S. 526, 534, 93 S.Ct. 1702, 1707–08, 36 L.Ed.2d 472 (1973); *Perkins v. Matthews*, 400 U.S. at 385, 91 S.Ct. at 435; *Allen v. State Bd. of Elections*, 393 U.S. 544, 560–64, 89 S.Ct. 817, 828–31, 22 L.Ed.2d 1 (1969); *White v. Alabama*, 922 F.Supp. 552, 554 (M.D.Ala.1996) (three-judge court); *Shuford v. Alabama State Bd. of Educ.*, 920 F.Supp. 1233, 1237–38 (M.D.Ala.1996) (three-judge court); *Henderson v. Harris*, 804 F.Supp. 288, 291 (M.D.Ala.1992) (three-judge court); *United States v. City of Houston*, 800 F.Supp. 504, 505 (S.D.Tex.1992) (three-judge court); *Lopez v. Hale County*, 797 F.Supp. 547, 549, 551 n. 6 (N.D.Tex. 1992) (three-judge court), *aff'd mem.*, 506 U.S. 1042, 113 S.Ct. 954, 122 L.Ed.2d 112 (1993); *Brooks v. State Bd. of Elections*, 775 F.Supp. 1470, 1474 (S.D.Ga.1989) (three-judge court), *aff'd mem.*, 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990); *United States v. Onslow County*, 683 F.Supp. 1021, 1023 (E.D.N.C.1988) (three-judge court); *Henderson v. Graddick*, 641 F.Supp. 1192, 1198 (M.D.Ala.) (three-judge court) (per curiam), *appeal dismissed*, 479 U.S. 1023, 107 S.Ct. 681, 93 L.Ed.2d 819 (1986); *Kirksey v. Allain*, 635 F.Supp. 347, 348 n. 2 (S.D.Miss.1986) (three-judge court); *Hardy v. Wallace*, 603 F.Supp. 174, 177, 179 (N.D.Ala. 1985) (three-judge court); *United States v. Louisville Mun. Separate Sch. Dist. Bd. of Trustees*, 557 F.Supp. 1168, 1171 (N.D.Miss.1983) (three-judge court); *Edge v. Sumter County Sch. Dist.*, 541 F.Supp. 55, 57 (M.D.Ga.1981) (three-judge court), *aff'd mem.*, 456 U.S. 1002, 102 S.Ct. 2287, 73 L.Ed.2d 1297 (1982); *Herron v. Koch*, 523 F.Supp. 167, 172–73 (E.D.N.Y., S.D.N.Y. 1981) (three-judge court); *Dotson v. City of Indianola*, 514 F.Supp. 397, 399 (N.D.Miss.1981) (three-judge court); *McRae v. Board of Educ. of*

Three-judge courts convened as we are have gone no further. *Cf. Puerto Rican Leg. Defense & Educ. Fund v. City of N.Y.,* 769 F.Supp. 74, 78 (E.D.N.Y.1991) ("A fair reading of the cases in which § 5 of the Voting Rights Act was the basis for injunctive relief justifies the conclusion that the traditional requirements for [obtaining a preliminary injunction] are not applicable.").

This practice among similarly situated three-judge panels makes eminent sense for at least three reasons. First, and most obviously, an injunction is the *only* remedy available for a § 5 violation. Outside of the § 5 context, plaintiffs ordinarily seek an injunction because they want to preserve the status quo pending a trial on the merits. However, in the context of a § 5 violation that must be remedied by a three-judge panel like this one, a trial on the merits is not an option. The Supreme Court has made it abundantly clear that our sole job is to ensure timely compliance with § 5: "The goal of a three-judge district court facing a § 5 challenge *must* be to ensure that the covered jurisdiction submits its election plan to the appropriate federal authorities for preclearance as expeditiously as possible." *Lopez v. Monterey County,* —— U.S. at ——, 117 S.Ct. at 349 (emphasis added); *see also Morris v. Gressette,* 432 U.S. at 495–96, 502, 97 S.Ct. at 2415–16, 2419 (holding in dictum that when the Attorney General interposes a § 5 objection, that objection "standing alone," is a sufficient basis for enjoining implementation of the voting change). Because the factors that courts consider in the context of issuing a preliminary injunction—substantial likelihood of success on the merits and irreparable harm, for example—are aimed at preserving the status quo pending trial, and because that contingency is simply absent in the context of a § 5 challenge such as this, the traditional preliminary injunction factors

have no place in our inquiry of whether an injunction should issue.

Second, the traditional test for issuing a preliminary injunction would produce results inconsistent with the scope of our jurisdiction and Supreme Court precedent. This is so because applying the first prong of the traditional injunction test—demonstrating a "substantial likelihood of success on the merits"—would be tantamount to squeezing the proverbial round peg into a square hole. If we were to conclude that the "merits" of this action included whether the annexations to the City Court had a retrogressive effect, we would be precluded from engaging in such an analysis because, as we have said, it is beyond our jurisdiction.

If, on the other hand, we defined the "merits" as encompassing whether the annexations to the City Court are covered changes requiring preclearance, the traditional analysis would potentially produce results flatly at odds with Supreme Court precedent. Assume that the United States in this case demonstrated to our satisfaction that the City Court annexations were covered by § 5 and that those covered changes had not been precleared. We would conclude, correctly, that the United States has a substantial likelihood of success on the merits. But suppose the facts of this case compelled us to conclude that the United States has not shown irreparable injury, the balance of interests favored the City and State, or that the public interest would be disserved by issuing an injunction. In this scenario, an injunction would not issue even though the United States demonstrated that covered changes had not been precleared. Such a result is foreclosed by Supreme Court precedent.

The Supreme Court, on at least three occasions, has set forth the requirements that must be met before an injunction issues in a

---

*Henry County,* 491 F.Supp. 30, 32 (N.D.Ga.1980) (three-judge court); *MacGuire v. Amos,* 343 F.Supp. 119, 120–21 (M.D.Ala.1972) (three-judge court); *United Ossining Party v. Hayduk,* 357 F.Supp. 962, 966 (S.D.N.Y.1971) (three-judge court); *Wilson v. North Carolina State Bd. of Elections,* 317 F.Supp. 1299, 1301–02 (M.D.N.C. 1970) (three-judge court).

The Fifth Circuit has come to the same conclusion. *See Campos v. City of Houston,* 968 F.2d

446, 451 (5th Cir.1992) (per curiam) (recognizing that three-judge panels like this one are courts "of limited jurisdiction and limited authority," and noting that our inquiry is "whether a voting change is covered by Section 5, whether the preclearance requirements have been met and, if they have not, what remedy is appropriate"), *cert. denied,* 506 U.S. 1050, 113 S.Ct. 971, 122 L.Ed.2d 126 (1993).

§ 5 preclearance case like this one. In *Allen v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, *Clark v. Roemer,* 500 U.S. 646, 111 S.Ct. 2096, and most recently in *Lopez v. Monterey County,* —— U.S. ——, 117 S.Ct. 340, the Supreme Court has said that "[i]f a voting change subject to § 5 has not been precleared, § 5 plaintiffs are *entitled* to an injunction prohibiting implementation of the change." *Lopez,* —— U.S. at ——, 117 S.Ct. at 347 (emphasis added); *see also Clark,* 500 U.S. at 652–53, 111 S.Ct. at 2100–02; *Allen,* 393 U.S. at 572, 89 S.Ct. at 835; *White v. Alabama,* 74 F.3d 1058, 1060 n. 4 (11th Cir. 1996); *Henderson v. Harris,* 804 F.Supp. at 293. Thus, as we have suggested, under the traditional analysis, we could conceivably conclude that a voting rights plaintiff has demonstrated that a covered voting change has not been precleared, yet decline to issue an injunction. *Lopez, Clark,* and *Allen* clearly counsel otherwise.

Third, the traditional four-part test for issuing a preliminary injunction is inconsistent with the general purpose behind § 5 of the Voting Rights Act as well as the purpose behind administrative preclearance. As we have said, § 5 was Congress's response to the ineffectiveness of case-by-case adjudication of voting rights violations. In *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, the Supreme Court made it clear that the remedies provided by § 5 did not require "prior adjudication." *Id.* at 328, 86 S.Ct. at 818–19. Rather, § 5 imposed upon state and local governments the responsibility, through the process of preclearance, of ensuring that its election practices did not have the purpose or effect of discriminating on the basis of race. If that responsibility

was not met, the elections and results taken pursuant to such violative schemes were declared null and void by operation of federal law. *See Morse v. Republican Party of Va.,* —— U.S. ——, ——–——, 116 S.Ct. 1186, 1202–03, 134 L.Ed.2d 347 (1996) (plurality opinion).

In the face of Congress's purpose in enacting § 5, it is simply inconceivable that we would have the authority to deny an injunction for the purpose of proceeding to a "trial on the merits." *See Heggins v. City of Dallas,* 469 F.Supp. 739, 743 (N.D.Tex.1979) (three-judge court) ("The threat and the pressure of an injunction provides a strong incentive for compliance with the Act."). There is nothing to try in this case after we determine whether the United States is entitled to injunctive relief.[12] The convening of this three-judge court pursuant to § 5 was done precisely to avoid the delay inherent in trials, such that we either issue an injunction because the United States has shown that a covered voting change has not been precleared, or we do not. End of story.[13]

We find *South Carolina v. United States,* 585 F.Supp. 418 (D.D.C.) (three-judge court), *appeal dismissed,* 469 U.S. 875, 105 S.Ct. 285, 83 L.Ed.2d 164 (1984), illustrative. There, the state of South Carolina argued that because it had a strong probability of success on the merits (the state claimed it had precleared a reapportionment plan), an injunction should not issue. The three-judge court dismissed the State's claim out of hand, concluding that "[t]he Court will not consider here South Carolina's contention that it is likely to prevail on the merits, because Section 5 is meant to prevent implementation

---

**12.** *Compare Brooks v. State Bd. of Elections,* 838 F.Supp. 601 (S.D.Ga.1993) (three-judge court) (applying the traditional preliminary injunction test after parties had reached a settlement and sought a modification of the three-judge court's prior order). *Brooks* certainly cannot be read as authority for the proposition that the traditional injunction test applies in a case like this. The same panel of judges earlier in the litigation was faced with precisely the same issues we face today, and the court did not apply any of the four traditional factors. Instead, the three-judge court determined, as we do here, whether the challenged legislation effectuated a covered change, whether that change was precleared,

and what remedy was appropriate. *Brooks,* 775 F.Supp. at 1474–84.

**13.** Of course, should we issue an injunction and the City and State decline to abide by this court's order, we would be required to take further action. Likewise, if circumstances changed such that our order is somehow moot or the parties reach an amicable agreement, we may have to revisit our original order. *See, e.g., Brooks,* 838 F.Supp. at 605–08. Plainly, we are not faced with any of these contingencies now, and we do not categorically rule out the use of the traditional preliminary injunction test in such post-injunction proceedings.

'without any need for prior adjudication' of actual discrimination." *Id.* at 422 n. 8 (quoting *Katzenbach,* 383 U.S. at 327–28, 86 S.Ct. at 818–19).

Here, the City and State have made an argument virtually indistinguishable from that made and rejected in *South Carolina v. United States.* Like that three-judge court, we too reject the City's and State's claim that if the United States fails to demonstrate a substantial likelihood of success on the merits or fails to meet the other three parts of the traditional preliminary injunction test, we should not issue an injunction.

Moreover, the traditional preliminary injunction test undermines the purpose of § 5 because it is inconsistent with the expedited administrative preclearance process prescribed by Congress. The Supreme Court has said that the process of administrative preclearance is designed to benefit the submitting jurisdiction because it imposed upon the Attorney General a relatively stringent 60–day period within which to interpose an objection to properly submitted voting changes. *See Morris v. Gressette,* 432 U.S. at 504, 97 S.Ct. at 2420; 28 C.F.R. § 51.41(a). The *Morris* Court recognized that "[i]n light of the potential severity of the § 5 remedy, the statutory language, and the legislative history, we think it clear that Congress intended to provide covered jurisdictions with an expeditious alternative to declaratory judgment actions." *Morris,* 432 U.S. at 504, 97 S.Ct. at 2420. As such, the Court declined in *Morris* to slow that process down by holding that courts cannot judicially review the Attorney General's failure to interpose an objection within the prescribed 60–day period. *Id.* at 504–07; *see also Leroy v. City of Houston,* 831 F.2d 576, 580 (5th Cir.1987) (recognizing that administrative preclearance provides "speedy, definitive oversight of local election procedures"), *cert. denied,* 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988).

*Morris* illustrates the particularly ironic conclusion the City and State would have us endorse through application of the traditional preliminary injunction test. Although the process of administrative preclearance is designed to *benefit* the City and State through an expeditious preclearance process, the City and State want us to *deny* them that benefit by proceeding to an illusory "trial on the merits." Such a conclusion would subvert the purpose of § 5's administrative preclearance procedure. Congress clearly intended that the process of administrative preclearance ends when the Attorney General either objects to the proposed voting change within 60 days (and later declines to withdraw her objection), or she does not. *Morris,* 432 U.S. at 502, 504, 97 S.Ct. at 2419, 2420. However, once the Attorney General interposes an objection, the *only* option available to a submitting jurisdiction is to obtain judicial preclearance through a declaratory judgment, and not wait around for a claim for injunctive relief (as the City and State have apparently done in this case) and then seek a trial on the merits. *See, e.g., United States v. Louisville Mun. Separate Sch. Dist. Bd. of Trustees,* 557 F.Supp. at 1171. If the Attorney General objects and the submitting jurisdiction does not obtain a declaratory judgment from the District Court for the District of Columbia, a three-judge panel like this one can enjoin the implementation of that unprecleared change. *Morris,* 432 U.S. at 495–96, 502, 97 S.Ct. at 2415–16, 2419. Clearly, there is no place in the process for a trial on the merits in this court.

We conclude that we have no jurisdiction to consider whether the Attorney General erred when it concluded the annexations to the City Court had a retrogressive effect. We also hold that the traditional four-pronged analysis for issuing an injunction simply does not comport with the clear jurisdictional mandate of this three-judge court, Supreme Court precedent, or the underlying purpose of § 5. We therefore turn to the well-established three-part inquiry that guides our decision today.

### III. The Three–Part Section 5 Inquiry

In this case, neither the City nor the State has sought a declaratory judgment in the District Court for the District of Columbia declaring that the annexations affecting the Shreveport City Court elections meet § 5's nonretrogression requirement. Rather, the City and State have sought, and have been

denied, administrative preclearance from the Attorney General. Specifically, the Attorney General interposed timely objections to the 300–plus annexations on the ground that (1) preclearance for the City Council elections did not imply preclearance for the City Court elections because the two bodies are separate political jurisdictions requiring separate preclearance, and (2) the annexations had the effect of diluting minority voting strength in the City Court elections. Accordingly, we now turn to the question of whether the United States has made a sufficient showing that the City Court annexations are covered changes within the meaning of § 5, whether those changes have been precleared, and if these first two requirements are met, what remedy is appropriate under the circumstances.

### A. The Annexations Affecting the City Court Elections are Covered "Changes" Within the Meaning of § 5

■ The City and State concede, as they must, that the City and State are "covered" jurisdictions for purposes of § 5 of the Voting Rights Act, 28 C.F.R. § 51 app. (1996); *see also* 28 C.F.R. § 51.6 (including cities within the definition of "political subunit[s]" subject to § 5's preclearance requirements), and that the 300–plus annexations to the City are "changes" that come within the scope of § 5, *see, e.g., Perkins v. Matthews,* 400 U.S. at 388–89, 91 S.Ct. at 436–37 (holding that annexations are "changes" subject to § 5 preclearance); 28 C.F.R. § 51.13(e)

14. *See City of Rome v. United States,* 446 U.S. 156, 168, 100 S.Ct. 1548, 1557, 64 L.Ed.2d 119 (1980) (holding that the reach of § 5 is " 'geographic' or 'territorial,' " so that "when an entire State is covered, it is irrelevant whether political units of it might otherwise come under § 5 as 'political subdivisions.')" (interpreting *Board of Commr's,* 435 U.S. at 126–29, 98 S.Ct. at 976–78); *Dougherty County,* 439 U.S. at 43–46, 99 S.Ct. at 374–76 (holding that a local school board, with no control over the voting process per se, was a "political subdivision" within the meaning of § 5); *United States v. Board of Commr's of Sheffield,* 435 U.S. 110, 129, 98 S.Ct. 965, 978, 55 L.Ed.2d 148 (1978) (holding that "where a political subdivision has been separately designated for coverage under § 4, *all political units within it* are subject to the preclearance requirement." (emphasis added)); 28 C.F.R. §§ 51.6, 51.13(e) (1996).

(1996) (listing "annexations" as a covered voting change). The City and State claim, however, that because the Justice Department precleared the annexations for the City in general (and the City Council elections in particular) and because the City Court's jurisdiction is coterminous with that of the City, the annexations affecting the City Court elections are not separate covered "changes" requiring separate Justice Department preclearance. The City and State are mistaken.

### 1. Analytical Framework and Guiding Principles

In some sense, this case presents a unique circumstance because the City Court has not played a role in effectuating a "voting change" as that term has been defined by the Supreme Court or within the applicable regulations. The United States has certainly not suggested that the City Court was responsible for the 300–plus annexations because the power to annex territory lies squarely with the City. Thus, because the City and State have conceded that the City is covered by § 5,[14] the City may be said to have effectuated a covered voting change if it changed a "voting qualification or prerequisite to voting, or standard, practice, or procedure" for one of its political subunits. 42 U.S.C. § 1973c; 28 C.F.R. § 51.6.[15] Our task, therefore, is to determine whether the City Court is a political subunit of the City because if it is, the City Court annexations are subject to § 5 preclearance.[16] We conclude that the

15. Sections 5 uses the term "political subdivision," whereas 28 C.F.R. § 51.6 uses the term "political subunit." We perceive no difference between these two terms, and so we use them interchangeably.

16. In its post-hearing brief, the United States argues that "[d]efendants have conceded that the annexations to the Shreveport City Court are covered by Section 5." United States' Post–Hearing Brief, at 6. The State, however, did not go so quietly. The attorney for the State simply conceded what he must—that the annexations *to the City* have to be precleared. Transcript of Proceedings, at 81, lines 17–21; at 90, lines 2–11. A review of the transcript of proceedings reveals that the State did not concede that the annexations, *as they affect the Shreveport City Court,* required § 5 preclearance. *Id.*

Shreveport City Court is a political subunit of the City.

Three well-established principles guide our analysis. First, "[t]o determine whether there have been changes with respect to voting, we must compare the challenged practices with those in existence before they were adopted." *Presley v. Etowah County Comm'n*, 502 U.S. 491, 495, 112 S.Ct. 820, 825, 117 L.Ed.2d 51 (1992). Only a change in such practices triggers § 5 scrutiny. Second, we must accord the Voting Rights Act "the broadest possible scope" and interpret the Act to reach any enactment that affects voting "in even a *minor* way." *Allen v. State Bd. of Elections*, 393 U.S. at 566, 567, 89 S.Ct. at 832–33 (emphasis added).[17] And third, we must conclude that the annexations affecting the City Court are a covered change if those annexations merely have a "*potential* for discrimination." *NAACP*, 470 U.S. at 181, 105 S.Ct. at 1137 (original emphasis); *see also Dougherty County*, 439 U.S. at 42, 99 S.Ct. at 374; *Georgia v. United States*, 411 U.S. at 534, 93 S.Ct. at 1707–08; *Brooks*, 775 F.Supp. at 1478.[18]

## 2. The Attorney General's Position

We have the benefit in this case of the Attorney General's interpretation of whether the City Court is a political subunit of the City. That view, expressed in 28 C.F.R. § 51.13(e) (which we discuss below), developed over the course of the correspondence with the City and State and has developed further in the Justice Department's pleadings in this matter. Accordingly, we first turn to the Attorney General's position on whether the annexations as they affected the City Court elections are covered changes, mindful that the Attorney General's interpretation of § 5 is entitled to considerable deference.[19]

In its correspondence with the City regarding the preclearance status of the Shreveport City Court, the Attorney General characterized the effect of the annexations on the City Court as follows:

We now address the claim made in earlier correspondence that since the city's municipal annexations have been precleared by the Department of Justice, they can be implemented for the city court as well. We find this claim unpersuasive. [1] At all times since the date of Louisiana's coverage under Section 5 of the Voting Rights Act the Shreveport City Court has had boundaries different than that of the city, and separate elected officers. [2] At least since 1978, the method of electing city court judges has differed from that of the city council, as has been the ability of minority voters to elect candidates of their choice. As you may know, the City of Shreveport did not have a method of election that fairly reflected minority voting strength until the city's attempt to annex areas which would dilute minority voting

---

**17.** *Accord Morse v. Republican Party of Va.,* — U.S. at ———, 116 S.Ct. at 1198–99; *Presley v. Etowah County Comm'n,* 502 U.S. at 501, 112 S.Ct. at 827–28; *NAACP v. Hampton County Election Comm'n,* 470 U.S. at 176 & n. 20, 105 S.Ct. at 1134 & n. 20; *United States v. Board of Commr's of Sheffield,* 435 U.S. at 122–23, 98 S.Ct. at 974–75; *Perkins v. Matthews,* 400 U.S. at 387, 91 S.Ct. at 436; *Garcia v. Guerra,* 744 F.2d 1159, 1163–64 (5th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 497 (1985); *Terrazas v. Slagle,* 821 F.Supp. 1154, 1159 (W.D.Tex.1992) (three-judge court) (per curiam); *Henderson v. Harris,* 804 F.Supp. at 292; *Kirksey v. Allain,* 635 F.Supp. at 349.

**18.** Of course, we cannot consider whether the annexations to the City Court *have in fact* had a discriminatory effect. That determination, as we have said, is beyond the jurisdiction of this three-judge court.

**19.** *See City of Pleasant Grove v. United States,* 479 U.S. 462, 468, 107 S.Ct. 794, 798, 93 L.Ed.2d 866 (1987) *NAACP v. Hampton County Election Comm'n,* 470 U.S. at 178–79, 105 S.Ct. at 1135–36; *Blanding v. DuBose,* 454 U.S. 393, 401, 102 S.Ct. 715, 719, 70 L.Ed.2d 576 (1982) (per curiam); *Dougherty County,* 439 U.S. at 39, 99 S.Ct. at 372–73; *United States v. Board of Commr's of Sheffield,* 435 U.S. at 131, 98 S.Ct. at 979; *Georgia v. United States,* 411 U.S. at 536–39, 93 S.Ct. at 1708–10; *Perkins v. Matthews,* 400 U.S. at 391, 91 S.Ct. at 438; *Mallory v. Eyrich,* 839 F.2d 275, 281 (6th Cir.1988); *Henderson v. Harris,* 804 F.Supp. at 292; *Hardy v. Wallace,* 603 F.Supp. at 177; *Lucas v. Bolivar County,* 567 F.Supp. 433, 437 (N.D.Miss.1983) (three-judge court). Twenty-three years ago, the Supreme Court rejected a challenge to the Attorney General's authority to issue regulations that shape the contours of the Voting Rights Act. *See Georgia v. United States,* 411 U.S. at 536–41, 93 S.Ct. at 1708–11.

strength resulted in a denial of preclearance under the *City of Richmond* standard and a 1978 change in election method.

Based on these differences it is clear that the Shreveport City Court is a separate entity from the city and that the effect of annexations to the city, including application of the *City of Richmond* standard, would be quite different than the resulting effect of annexations altering the city court boundaries.

United States' Orig. Complaint, Exh. C, at 3–4. At oral argument, the United States elaborated somewhat on the Attorney General's method of determining covered "changes" to voting for purposes of § 5, arguing that the annexations affecting the City Court, as compared to the City Council, were covered changes because

> [the Attorney General] didn't also look at the body, the number of people who are different; in other words, the governing body is important, whether or not you are dealing with one individual that is being elected or whether you're dealing with multiple people who are being elected. In this case, there had been no analysis by the Department of Justice as to the electorate, as to the body, which is this two-person court, and the effect that that would have on whether or not there was a discriminatory purpose or a discriminatory effect.

Transcript of Proceedings, at 111.

In 1994, the Attorney General also informed the City and the State that the annexations had a discriminatory effect. The Attorney General argued that "local judicial elections are characterized by racial bloc voting and that, in this context, the annexations effect a significant reduction in the opportunity of black voters to elect candidates of their choice in city court elections." *Id.*, Exh. A, at 2; *see City of Port Arthur v. United States*, 459 U.S. 159, 167, 103 S.Ct. 530, 535, 74 L.Ed.2d 334 (1982) (reasoning that racial bloc voting is a relevant determination of whether a voting change has a discriminatory effect). In 1996, the Attorney General claimed that, based on 1990 Census data, the black vote within the two City Court districts had been diluted: "[T]he

black percentage of the city court's electoral jurisdiction [declined] from 56 to 45 percent." *Id.*, Exh. B, at 2.

The Supreme Court has said that "[a]s in other contexts in which we defer to an administrative interpretation of a statute, we do so only if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable." *Presley v. Etowah County Comm'n*, 502 U.S. at 508, 112 S.Ct. at 831 (citing *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)). When "reasonable minds may differ as to whether some particular changes in the law of a covered jurisdiction should be classified as changes in rules governing voting ... § 5 leaves a gap for interpretation to fill." *Id.* at 509, 112 S.Ct. at 831–32. Where congressional intent is ambiguous as to the reach of § 5, we may defer to the judgment of the Attorney General if she "makes a reasonable argument that a contested change should be classified as a change in a rule governing voting...." *Id.*

■ Accordingly, if Congress has already made its intent clear regarding the applicability of § 5 to judicial districts like the Shreveport City Court, we would not be bound by the Attorney General's interpretation. On its face, § 5 applies to "political subdivisions," yet the statute does not explicitly state that judicial districts (like Divisions A and B of the Shreveport City Court) are "political subdivisions" under § 5. Although not conclusive of congressional intent, Senator Hatch's statement in the legislative history accompanying the 1982 amendments to the Act explicitly suggests that judicial districts are covered under § 5. He stated that the term " 'political subdivision' encompasses all governmental units, including city and county councils, school boards, *judicial districts*, utility districts, as well as state legislatures." S.Rep. No. 417, 97TH CONG., 2D SESS. 151, *REPRINTED IN* 1982 U.S.C.C.A.N. 177, 323 (EMPHASIS ADDED).

On balance, however, we find that Congress has not expressed a clear intent with respect to the meaning and scope of the term

"political subdivision," such that we can comfortably conclude that Congress clearly intended to include judicial districts, like the Shreveport City Court, within the definition of "political subdivision." We therefore must determine whether the Attorney General's interpretation of § 5—that the Shreveport City Court *is* a separate political subdivision requiring administrative or judicial preclearance—is reasonable.

■ We conclude that it is. First, the Shreveport City Court was established in 1898 (Act No. 103) under legislation different from that creating the City Council. Second, the electorate for the Shreveport City Court is different from the electorate for the City. For example, the Shreveport City Court covers Ward 4 of Caddo Parish, which, according to the City's own Charter (§ 16.01 (1990 ed.)), is not included within the boundaries or jurisdiction of the City. Third, the method of electing members to the Shreveport City Council (for which the 300–plus annexations have been precleared) is different from the method of electing City Court judges. The Shreveport City Court elections are held at-large, whereas the City in the 1970s changed the method of electing the City Council from at-large to single-member districts.

As we noted above, the Attorney General has promulgated a regulation that defines a covered change as "[a]ny change in the constituency of an official or the boundaries of a voting unit." 28 C.F.R. § 51.13(e). This regulation mirrors the Supreme Court's holding in *Presley* that a covered change for § 5 purposes includes "changes in the composition of the electorate that may vote for candidates for a given office. [Citations.]." 502 U.S. at 503, 112 S.Ct. at 828. In this case, when the Attorney General first learned that the City was conducting elections for the City Court which included the annexations that had been previously precleared only for the City Council, he cited, among other things, § 51.13 and advised the State that it needed to preclear those annexations for purposes of holding City Court elections. United States' Orig. Complaint, Exh. B.

In light of the broad scope of § 5 and the substantial deference we must pay to the Attorney General's interpretation of § 5, we are convinced that the Attorney General's position that the City Court is political sub-unit of the City and that the annexations affecting the City Court have the potential for discrimination, is eminently reasonable. The three factors we have outlined above plainly indicate that the City Court operates under a different election scheme than the City Council and other political offices within the City. Moreover, the Attorney General's definition of a "voting change" (expressed, as we have said, in 28 C.F.R. § 51.13(e)) is virtually identical to the Supreme Court's interpretation of a "voting change" in *Presley*. Finally, the Attorney General has consistently asserted since 1989 that the City Court annexations required § 5 approval and that the annexations have a retrogressive effect.

This case certainly does not present the situation faced by the Supreme Court in *Presley*. There, the Attorney General concluded that the decisionmaking authority among elected officials is a covered change requiring § 5 preclearance. The Court refused to defer to this interpretation of § 5 because the allocation of power within local elective office was not a "voting change" within the meaning of § 5. 502 U.S. at 509–10, 112 S.Ct. at 831–32. "Covered changes," reasoned the Court, "must bear a direct relation to voting itself.... The changes in Etowah and Russell Counties affected only the allocation of power among governmental officials." *Id.* at 510, 112 S.Ct. at 832.

This case is more akin to *NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 105 S.Ct. 1128. There, the Court deferred to the Attorney General's determination that the change in the date of an election was covered by § 5. The Court justified its deference on the ground that the Attorney General had consistently interpreted § 5 to cover such actions by political bodies. *Id.* at 179, 105 S.Ct. at 1135–36; *see also City of Pleasant Grove v. United States*, 479 U.S. at 468, 107 S.Ct. at 798 (deferring to the Attorney General's interpretation of § 5 because the Attorney General adhered to a consistent interpretation of § 5). The same holds true in this case: From the start, the Attorney General has remained firm that the City

Court annexations were covered changes requiring § 5 preclearance. Since 1989, the first time the Attorney General learned that the Shreveport City Court elections included the 300–plus annexations, the Attorney General has insisted that the City and State obtain preclearance for those annexations. And since 1994, when the Attorney General interposed a timely objection to the City Court annexations, the Attorney General has repeatedly reminded the City and State that it would not withdraw the objection.

### 3. Independent Justifications

Two justifications independent of the Attorney General's position support our conclusion that the City Court is a political subunit of the City. First, if we were to conclude that the City Court is not a political subunit of the City, we would be construing § 5 as narrowly as possible, a result inconsistent with the purpose behind § 5. As we have pointed out, it is well-settled that § 5 is designed to cover even "minor" voting changes, and that courts ought to read the scope of § 5 as broadly as possible. Given the differences in the method of election, size of office, and geographic reach between the City Court and other elective offices within the City, we would be contracting the scope of § 5 by concluding that the City Court annexations did not require federal approval.

Second, and closely related to the first point, if we were to accept the City's and State's position that the annexations effectuated by the City produced a single, in global voting change, we would immunize from § 5 scrutiny a wide array of voting changes by effectively eliminating the specificity requirement from the administrative preclearance process. This is so for obvious reasons. One of the underlying purposes of the specificity requirement is to ensure that covered jurisdictions do not subvert the § 5 approval process by burying discriminatory changes in voting within a voluminous submission. If we were to conclude that the objected-to

annexations in this case produced one change, we would eliminate the City Court elections from the scope of § 5 even though the annexations have had a different effect on the City Court elections than, for example, the City Council elections. Administrative preclearance means nothing if courts so narrowly construe the reach of § 5 that the specificity requirement is eliminated. This cannot be the law.

### 4. The City's and State's Objections to Finding a Covered Change

The City and State claim that if we were to hold that the annexations as they affect the Shreveport City Court are separate changes requiring separate preclearance, we would nullify Section 1952 of Act No. 32 (1960), which provides as follows:

> The following city courts, heretofore created and established by special legislative act are hereby recognized and continued in existence, and except as otherwise provided in this section, their territorial jurisdiction shall extend through the city and ward or wards wherein the city in which they are domiciled is located, *as extended from time to time.*

(Emphasis added.) Nullification occurs, the City and State argue, because by requiring preclearance for the City Court, we would be declaring that the jurisdiction and boundaries are not, as § 1952 states, coterminous with those of the City. We disagree.

We do not interpret the United States' request for injunctive relief as a backdoor attempt to obtain preclearance for a pre-Voting Rights Act statute. Plainly, the 1960 law operates as enabling legislation which provides authority for the extension of the City Court's boundaries when those of the City expand. However, each annexation to the City Court implemented pursuant to that law after November 1, 1964, comes within § 5's preclearance requirement. *See, e.g.,* 28 C.F.R. § 51.15(a), (b)(1) (1996).[20] If this

---

**20.** Section 51.15 of the Code of Federal Regulations provides in part:

(a) With respect to legislation (1) that enables or permits the State or its political subunits to institute a voting change or (2) that requires or enables the State or its political subunits to

institute a voting change upon some future event or if they satisfy certain criteria, the failure of the Attorney General to interpose an objection does not exempt from the preclearance requirement the implementation of the particular voting change that is enabled, per-

were not so, many annexations would not have to be precleared because they are effectuated pursuant to pre-Voting Rights Act enabling statutes like § 1952, a result inconsistent with the purpose of § 5. *See, e.g., Terrazas v. Slagle,* 821 F.Supp. at 1161.

To sum up, after careful consideration of the parties' contentions and the case law in this area, we conclude that the annexations as they affect the Shreveport City Court elections are covered changes within the meaning of § 5 of the Voting Rights Act. As such, the City Court annexations require § 5 preclearance.

### B. The Annexations Affecting the Shreveport City Court Elections Were Not Precleared

We now turn to the United States' contention that the annexations have not been precleared by the Attorney General. The City and State claim that they do not need to preclear, for a "second time," annexations affecting the Shreveport City Court elections because the same annexations have been precleared for the City in general and the Shreveport City Council in particular. The City and State assert a theory of preclearance by implication, and we reject it.[21]

The Supreme Court, lower federal courts, and the applicable regulations uniformly require submitting jurisdictions to identify with *specificity* the changes sought to be precleared.[22] "Even an informed submission of a change in voting procedures does not satisfy the [preclearance] requirements of § 5...." *NAACP v. Hampton County Election Comm'n,* 470 U.S. at 182,

105 S.Ct. at 1137. The change affecting voting must be presented to the Attorney General "in some unambiguous and recordable manner." *Allen,* 393 U.S. at 571, 89 S.Ct. at 834.

In the seminal decision of *McCain v. Lybrand,* 465 U.S. 236, 104 S.Ct. 1037, the Supreme Court flatly rejected an implied preclearance theory similar to the one urged here. In *McCain,* South Carolina enacted a statute in 1966 that changed election practices in a county. The statute was not submitted for § 5 approval. Then, in 1971, the statute was amended, modifying the 1966 election practices, and state officials submitted the amendment to the Attorney General for approval. The Attorney General requested more information, including the 1966 statute, and the proposed amendment was thereafter approved. Under these circumstances, the Court held that the 1966 enactment was not precleared. Recognizing the limited resources of the Justice Department together with the need to enforce § 5, the Supreme Court held that

[i]n light of the structure, purpose, history, and operation of § 5, we have rejected the suggestions that the Act contemplates that a submission occurs when the Attorney General merely becomes aware of legislation, no matter in what manner, and instead have held that [a] fair interpretation of the Act requires that the State in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act.

mitted or required, unless that implementation is explicitly included and described in the submission of such parent legislation.
(b) For example, such legislation includes—
(1) Legislation authorizing counties, cities, school districts, or agencies or officials of the State to institute any of the changes described in § 51.13, ....
Section 51.13(e) lists annexations as a change within the meaning of § 5. 28 C.F.R. § 51.13(e).

21. We shall later discuss the State's (puzzling) contention that it is not asserting a preclearance-by-implication theory.

22. *See Lopez v. Monterey County,* — U.S. at —, 117 S.Ct. at 345; *Clark v. Roemer,* 500 U.S. at 657-58, 111 S.Ct. at 2103-04; *McCain v. Lyb-*

*rand,* 465 U.S. at 249, 104 S.Ct. at 1045-46; *City of Rome v. United States,* 446 U.S. at 169 n. 6, 100 S.Ct. at 1557 n. 6; *United States v. Board of Commr's of Sheffield,* 435 U.S. at 136-38, 98 S.Ct. at 981-83; *Allen v. State Bd. of Elections,* 393 U.S. at 571, 89 S.Ct. at 834-35; *Shuford v. Alabama State Bd. of Educ.,* 920 F.Supp. at 1240-41; *Brooks v. State Bd. of Elections,* 775 F.Supp. at 1479; *Haith v. Martin,* 618 F.Supp. 410, 413 (D.C.N.C.1985), *aff'd mem.,* 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986). The Attorney General's regulations also impose the specificity requirement on submitting jurisdictions. *See* 28 C.F.R. §§ 51.15(a), 51.27(c) (1996).

*Id.* at 249, 104 S.Ct. at 1045–46 (internal quotations and citations omitted). The Court reasoned that "the preclearance procedures mandated by § 5 of the Voting Rights Act focus entirely on *changes* in election practices." *Id.* at 251, 104 S.Ct. at 1046 (original emphasis). The *McCain* Court concluded as follows:

> The fact that a covered jurisdiction adopted a new election practice after the effective date of the Voting Rights Act raises, in effect, a statutory inference that the practice may have been adopted for a discriminatory purpose or may have a discriminatory effect and places the burden on the jurisdiction to establish that the practice is not discriminatory. *A request for preclearance of certain identified changes in election practices which fails to identify other practices as new ones thus cannot be considered an adequate submission of the latter practices.*

*Id.* at 256–57, 104 S.Ct. at 1049 (emphasis added). *McCain* therefore suggests that changes to election practices (such as those affecting the Shreveport City Court) specifically must be brought to the attention of and receive approval from the Attorney General before those changes are deemed precleared.

The Supreme Court twice reaffirmed the specificity principle at work in *McCain.* In *Clark v. Roemer,* 500 U.S. 646, 111 S.Ct. 2096, the Court rejected a claim similar to the one rejected in *McCain.* In *Clark,* the Court reversed the decision of a three-judge panel, which had held submission and approval of a later electoral change amounted to submission and approval of an earlier electoral change. The Court criticized the three-judge court for "replicat[ing] the precise factual and legal errors [the Court] identified in *McCain."* *Id.* at 657, 111 S.Ct. at 2104. *McCain,* according to the *Clark* Court, "establishes a *presumption "* that the Attorney General is required to review only those changes identified with specificity. *Id.* at 657–58, 111 S.Ct. at 2103–04 (emphasis added).

More recently, in *Lopez v. Monterey County,* —— U.S. ——, 117 S.Ct. 340, the Court reaffirmed the specificity requirement for § 5. There, the State claimed that administrative preclearance of a state law implied preclearance for a County consolidation ordinance that had never been submitted or approved by the Attorney General. Relying on *McCain* and *Clark,* the Court, in a unanimous decision, rejected the claim on the ground that the State had not brought the ordinance to the Attorney General's attention when the State submitted the state law for approval. *Id.* at ——, 117 S.Ct. at 345.

We have reviewed every correspondence submitted by the parties between the Justice Department and the City regarding preclearance for the annexations to the City. *The City Court is never mentioned.* Accordingly, *McCain, Clark,* and *Lopez* compel the conclusion that the annexations to the City Court have not been precleared.

In addition, it was not until 1989, when the State submitted its proposal to add two judges to the City Court, that the Justice Department first learned that elections for the City Court included the annexations that were precleared for the City Council. In other words, in the State's original submission for § 5 preclearance for the City Council, the State did not even mention, much less allude to, the City Court. Thus, under these facts, it would be anomalous for us to hold that the annexations affecting the City Court were impliedly precleared even though the Attorney General knew nothing about the unsubmitted changes to the City Court's voting practices, when the Supreme Court in *McCain* and *Clark* rejected the notion of implied preclearance where the Attorney General was *aware* of an unsubmitted, unprecleared voting change.

In light of the facts, the clear dictates in the case law, and the arguments made to this court by the United States, the State continues to insist that it is not asserting a theory of preclearance by implication. According to the State, it "has never made any allegations that the 300 annexations are implicitly precleared. The state's argument is that the 300 annexations have, in fact, been precleared." State's Post–Hearing Brief, at 7. This argument is belied by the fact that the *only* position that can possibly justify the State's contention in this case is preclearance by implication. The State's justification for

its claim that the annexations to the City Court have "in fact" been precleared is that the City Court is not a political subunit of the City requiring separate preclearance for any annexations effectuated by the City that affect voting. But as we have said, the City Court *is* a political subunit of the City, so that for us to hold in favor of the State in the face of this fact necessarily requires us to embrace a preclearance-by-implication theory. This we decline to do.

We also cannot accept the City's contention that the specificity requirement is satisfied because the City Charter was among the materials submitted to and approved by the Attorney General, and that within the Charter, the City Court is mentioned.[23] First, the City Charter does not detail the election practices as they relate to the City Court. In fact, the fifty-six page Charter says precious little about the City Court. Under the caption "MISCELLANEOUS AND TRANSITIONAL PROVISIONS," the City Court is described in *one sentence:* "There shall continue to be a city court with one or more judges and a marshal for the City of Shreveport and Ward Four of Caddo Parish, as now or hereafter provided by law." City Charter, at 53. Nothing so unexceptional can persuade us that the Attorney General was on notice that the methods for holding City Court elections were submitted for preclearance when the State submitted the City Charter.[24]

Second, and most importantly, the City's contention is flatly at odds with *McCain, Clark,* and *Lopez,* for even if the City Court elections were specifically described within the Charter, the fact remains that the City did not specifically draw the Attorney General's attention to the purported nonretrogressive effect the annexations would have on the City Court elections. As we have said, the

Attorney General is not charged (nor can she be) with sifting through a jurisdiction's voluminous submission[25] to determine all possible voting changes that have been submitted for preclearance. Yet that is precisely what the City and State are asking us to hold in this case. We decline the invitation and follow the unwavering view among federal courts that a submitting authority must identify with specificity the voting changes for which the submitting jurisdiction seeks preclearance.

The State also attempts to shift the blame onto the United States for its failure to meet the specificity requirement. In their post-hearing brief, they claim that

[w]hen the city submitted the annexations in the 1970's, from a review of the letters [exchanged between the Justice Department and the City of Shreveport], it is clear that the city made the submission on behalf of the city, not on behalf of the office of city council, not on behalf of the office of mayor, not on behalf of the office of the city marshal, etc., etc. Why then has the government not argued that the annexations were not precleared with respect to the office of mayor and with respect to the office of city marshal, when the city's letters in 1970 requested review for the purpose that the annexed territory would not have the purpose or effect of denial of voting rights based on race[?] *The city's letters were submitted with one purpose in mind, their effect under § 5 with regard to voting in the city of Shreveport.* It is that clear and simple, yet the government demands a separate submission for another bite at the apple with regard to only one "political jurisdiction", the city court, forgetting the office of mayor and the office of marshal.

**23.** We note that the City submitted to us the 1990 amended version of Shreveport's City Charter, not the 1978 version submitted to the Attorney General for preclearance. This fact, however, is inconsequential because we hold that preclearance of the Charter does not imply preclearance for the City Court elections.

**24.** To the extent the City and State suggest that the Attorney General is charged with notice of all provisions of local law when a document like the

City Charter is submitted for preclearance, we reject the contention as, in the Supreme Court's words, "extreme." *United States v. Board of Commr's of Sheffield,* 435 U.S. at 137 n. 28, 98 S.Ct. at 982 n. 28.

**25.** The City informed this Court at the hearing that the submission for the 300–plus annexations to the City measured eight-feet high. Transcript of Proceedings, at 47.

State's Post–Hearing Brief, at 7–8 (emphasis added). This is hyperbole. It also demonstrates that the State fundamentally misunderstands the workings of § 5 of the Voting Rights Act.

 If by the above statements the State is suggesting that it acted in good faith, we reject the argument because good faith is irrelevant to our inquiry. *See NAACP v. Hampton County*, 470 U.S. at 180, 105 S.Ct. at 1136; *Allen*, 393 U.S. at 565 n. 29, 89 S.Ct. at 831 n. 29. Alternatively, if the State is asserting that the Justice Department should have known that the submitted annexations also affected the City Court, we reject that contention too because, in light of the absence of any mention of the City Court in the City's submission, "*any* ambiguity in the scope of a preclearance request must be resolved against the submitting authority." *Clark ·v. Roemer*, 500 U.S. at 656, 111 S.Ct. at 2103 (emphasis added). And third, if the State is suggesting that the Justice Department bears the burden of ensuring compliance with § 5, the State's position is flatly inconsistent with the well-established purpose of § 5, which is to "shift the advantage of time and inertia from the perpetrators of the evil [of race discrimination in voting] to its victims." *South Carolina v. Katzenbach*, 383 U.S. at 328, 86 S.Ct. at 818; *see also Lopez v. Monterey County*, —— U.S. at ——, 117 S.Ct. at 348 ("Congress designed the preclearance procedure 'to forestall the danger that local decisions to modify voting practices will impair minority access to the electoral process.' ") (quoting *McDaniel v. Sanchez*, 452 U.S. 130, 149, 101 S.Ct. 2224, 2235–36, 68 L.Ed.2d 724 (1981)).

Finally, the State claimed at the hearing that once an election *system* is precleared (like that of the City), changes in the operation of that system do not have to be precleared. In support of this proposition, the State relied on *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), which, according to the State, purportedly holds that preclearance of a general election system implies preclearance for changes in the implementation of that system. We reject the State's contention.

*Beer* involved at-large seats that were in existence prior to the effective date of the Voting Rights Act. In this case, the annexations occurred after the effective date, and are therefore covered by § 5. With that said, we repeat what we have already said: *McCain, Clark*, and the Supreme Court's recent unanimous decision in *Lopez* categorically and explicitly reject any notion, no matter how creative, of implied preclearance in § 5 actions like this one.

In sum, the United States has demonstrated that the annexations affecting the City Court elections are changes requiring § 5 preclearance and that the City did not obtain preclearance for those annexations. The Supreme Court has said that once a plaintiff makes this showing, the remaining inquiry for a three-judge court is to fashion an injunctive remedy. *Lopez v. Monterey County*, —— U.S. at ——, ——, 117 S.Ct. at 347, 349. We turn to that issue now.

### C. The Remedy

In the United States' original complaint, the Justice Department asked us to enjoin the City Court elections because they were being held pursuant to an unprecleared election scheme. United States Orig. Complaint, at 11. As we have said, however, the Justice Department was not aware that the incumbent judges running in Districts A and B were unopposed, and under Louisiana law, unopposed candidates are deemed elected at the conclusion of candidate qualifying. *See* La.R.S. 18:511(B) (West 1996). The United States' original prayer for injunctive relief therefore became moot.

The United States thereafter filed an amended motion for a preliminary injunction (the subject of this proceeding) seeking to enjoin the "elected" incumbent judges from receiving commissions for a new six-year term. In that complaint, the United States sought one of two remedies: order the City and State to seek a declaratory judgment in the District Court for the District of Columbia or, alternatively, void the election and order new elections that do not include the unprecleared annexations. The United States did not argue that the City Court judges should be allowed to holdover pending

the results of a declaratory judgment action in the District Court for the District of Columbia.

However, during the hearing in this matter and in its post-hearing briefing, the United States has informed us that (1) they do not seek to void the elections and remove the City Court judges from office, (2) we should prevent any further implementation of the election results by enjoining the issuance of a new six-year commission, (3) we should order the City and State to seek a declaratory judgment in the District Court for the District of Columbia, and (4) it has no objection to permitting the incumbent judges in Districts A and B to holdover until the City has obtained judicial preclearance.

In fashioning an injunctive remedy for a § 5 violation, we must "adopt a remedy that in all the circumstances of the case implements the mandate of § 5 in the most equitable and practical manner and with least offense to its provisions." *Clark v. Roemer,* 500 U.S. at 660, 111 S.Ct. at 2105. The Supreme Court has advised three-judge courts like this one that the injunctive remedy should be practical and comport with local conditions insofar as possible and at the same time effectuate the purpose of § 5. *See Clark v. Roemer,* 500 U.S. at 659–60, 111 S.Ct. at 2104–05; *Hathorn v. Lovorn,* 457 U.S. 255, 270, 102 S.Ct. 2421, 2430–31, 72 L.Ed.2d 824 (1982); *Perkins v. Matthews,* 400 U.S. at 397, 91 S.Ct. at 441.

What complicates our task is that this case presents a clash of competing policy objectives that animate the crafting of a § 5 injunctive remedy. On the one hand, courts have held that local officials who have violated § 5 should not be rewarded for any delay in obtaining proper preclearance from federal officials. *See, e.g., United States v. Onslow County,* 683 F.Supp. at 1023. On the other hand, a § 5 remedy should not throw a City's political or legal system into chaos or materially undermine the expectations of the electorate and those seeking elective office for purposes of effectuating the purposes of § 5. *See, e.g., United States v. City of Houston,* 800 F.Supp. at 506; *Lopez v. Hale County,* 797 F.Supp. at 550.

Both of these policies are implicated here. The City's and State's conduct over the past seven years convinces us that neither entity has properly discharged its § 5 responsibilities. Since 1989, the City and State have known that the City Court annexations had to be precleared before elections under the new election scheme would be satisfactory to federal officials. Moreover, in 1994, the Attorney General interposed a timely objection to the City Court annexations, and it was at that point that the State asserted, for the first time, its new position that preclearance was not needed because, in the State's eyes, it had already obtained preclearance in the 1970s. In view of the case law in this area, the City's and State's positions were unreasonable.

At the same time, voiding the City Court elections and removing the incumbent judges from office would cause serious disruption within the judicial system of the City. In this scenario, the judicial business of the City is likely to go unattended for at least some period of time. In addition, although no election was held, candidates and the electorate in the City proceeded into candidate qualifying with settled expectations about the validity of the elections for Districts A and B of the City Court. Courts have been quite reluctant to upset these expectations through § 5 injunctive relief. *See United States v. City of Houston,* 800 F.Supp. at 506; *Lopez v. Hale County,* 797 F.Supp. at 550.

After careful consideration of the circumstances surrounding the City Court "elections" as well as the policies underlying § 5 injunctive relief, we grant the relief requested by the United States.

*1. Declaratory Judgment and Holdover*

■ The Supreme Court has said that an appropriate remedy for a § 5 violation is to order the violating jurisdiction to seek a declaratory judgment in the District Court for the District of Columbia. *See Hathorn v. Lovorn,* 457 U.S. at 270 n. 24, 102 S.Ct. at 2430 n. 24. Because Congress intended § 5 approval to come by way of administrative or judicial preclearance and because the Attorney General declined to administratively preclear the City Court annexations, we have

ordered the City and State to seek judicial preclearance by filing a declaratory judgment action with the District Court for the District of Columbia within 45 days of the entry of the Order in this case (December 20, 1996).[26] As such, we enjoin Louisiana's Secretary of State from issuing the "elected" City Court judges their commissions for a new six-year term.

In the meantime, we shall permit the incumbent City Court judges in Districts A and B to holdover in their offices until the merits of the declaratory judgment action have been conclusively determined. We derive our authority for permitting the City Court judges to holdover from our general equitable powers to shape a workable § 5 injunctive remedy as well as Louisiana law.

As we have said, we have broad equitable powers to craft a § 5 remedy that best comports with local conditions as well as § 5 of the Voting Rights Act. Faced with a similar contingency, at least one other three-judge court has allowed the officials occupying positions declared illegal to holdover pending § 5 approval of the voting changes. *See Brooks v. State Bd. of Elections*, 790 F.Supp. 1156, 1157 (S.D.Ga.1992).

Permitting the incumbent judges to remain in office pending resolution of the declaratory judgment action provides the least disruption to the City's judicial system while at the same time furthers § 5's purpose of preclearing voting changes as expeditiously as possible. By allowing the City Court judges to holdover, we are not in any way "implement-

ing" an illegal election scheme because we have enjoined the Secretary of State from issuing those judges new six-year commissions. At the same time, by ordering the judges to holdover, we would not disrupt the judicial system in the City because the City Court judges in Districts A and B shall enjoy the same responsibilities and the same authority they have now. Nothing we say today should be construed as undermining the legitimacy of the decisions handed down by the incumbent judges.

More to the point, the Shreveport City Court will experience little, if any, disruption because the Louisiana Legislature has given its blessing to the concept of holdover. Louisiana election law contains a holdover provision permitting "[e]very public officer in this state ... [to] continue to discharge the duties of his office until his successor is inducted into office." La.R.S. 42:2 (West 1990). We note, however, that the applicability of 42:2 to City Court judges is not a foregone conclusion. The Fifth Circuit has held in *Chisom v. Roemer*, 853 F.2d 1186 (5th Cir.1988) that section 42:2's applicability to judges is an "open question" because the Louisiana Supreme Court has not yet decided the question. *Id.* at 1191.[27] Although the Louisiana Supreme Court has not specifically held that section 42:2 applies to City Court judges, developments in Louisiana law since *Chisom* persuade us that the Louisiana Supreme Court would apply section 42:2 to City Court judges.[28]

Our conclusion with regard to holding over is consistent with the § 5 case law. The

---

**26.** We note that courts, including the Supreme Court and the Fifth Circuit, have imposed a more stringent 30–day time frame within which jurisdictions in violation of § 5 must obtain federal approval of voting changes. *See NAACP v. Hampton County Election Comm'n*, 470 U.S. at 182, 105 S.Ct. at 1137; *Trinidad v. Koebig*, 638 F.2d 846, 847–48 (5th Cir. Unit A Mar. 1981); *Dillard v. City of Foley*, 926 F.Supp. 1053, 1073 (M.D.Ala.1995) (describing the terms of a court-approved consent decree).

**27.** The City and State have taken different positions on this question. The attorney for the State conceded at the hearing in this matter that 42:2 applies to City Court judges. Transcript of Proceedings, at 75. The City, however, in its post-hearing briefing disagrees and relies on the Fifth Circuit's decision in *Chisom v. Roemer*, 853 F.2d

1186 for the proposition that 42:2 does not apply to the Shreveport City Court judges.

**28.** *See Miller v. Oubre*, 682 So.2d 231, 237 (La. 1996) (holding, without much discussion, that section 42:2 applies to justices of the peace and constables); La. Atty. Gen. Opn. 90–595 (Dec. 21, 1990) (holding that when voting changes to a city court have not been precleared by federal authorities, the judges in the unprecleared seats may holdover in their offices until proper federal approval has been obtained); *see also Small v. Guste*, 383 So.2d 1011, 1014 (La.1980) (holding that section 42:2 applies to district judges); *State v. Cage*, 196 La. 341, 199 So. 209, 211 (1940) (holding that district judge may holdover until successor elected pursuant to article XIX, section 6 of prior version of the Louisiana Constitution).

Supreme Court has held that when an election has already been held and local officials have not sought administrative or judicial preclearance, three-judge courts should "enter an order affording local officials an opportunity to seek federal approval and ordering a new election only if local officials fail to do so *or if the required federal approval is not forthcoming." Perkins v. Matthews,* 400 U.S. at 396–97, 91 S.Ct. at 441 (emphasis added); *see also Lopez v. Monterey County,* —— U.S. at ——, 117 S.Ct. at 347; *Clark v. Roemer,* 500 U.S. at 654, 111 S.Ct. at 2102; *NAACP v. Hampton County Election Comm'n,* 470 U.S. at 182–83, 105 S.Ct. at 1137–38; *Berry v. Doles,* 438 U.S. 190, 192, 98 S.Ct. 2692, 2693–94, 57 L.Ed.2d 693 (1978) (per curiam). We do not, however, read these cases as standing for the proposition that elections held pursuant to an illegal election scheme *automatically* requires us to void the election results, remove the City Court judges from office, and order new elections which do not include the unprecleared annexations. *See, e.g., United States v. City of Houston,* 800 F.Supp. at 505. Those cases plainly condition ordering new elections on a failure to obtain *"federal* approval," which may come in the form of administrative or judicial preclearance. Thus, in our view, the Supreme Court has said that if an illegal election has been held (as in this case because the Attorney General interposed a timely objection and judicial preclearance has not been obtained) and the submitting jurisdiction has been given an opportunity but has failed to obtain administrative and/or judicial preclearance, voiding the illegal elections and ordering new elections is required. Because neither the City nor the State have sought judicial preclearance for the annexations, we are not compelled to void the election results and order new elections.

Our understanding of the Supreme Court's views on this matter comports with that of the three-judge court in *Brooks v. State Bd. of Elections,* 790 F.Supp. 1156. There, the court permitted incumbent judges to holdover, and in reaching that conclusion reasoned as follows:

> There is a distinction between allowing incumbent judges to remain in their posts

pending the outcome of the declaratory action, and allowing the Governor to appoint judges to newly-created, unprecleared judgeships.... Our decision to permit the incumbent judges ... to remain in office, subject to certain contingencies, *is a narrow exception to the general rule* that "[i]f voting changes subject to § 5 have not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting the State from implementing the changes."

*Id.* at 1160–61 (quoting *Clark v. Roemer,* 500 U.S. at 652–53, 111 S.Ct. at 2100–02 (citing *Allen v. State Bd. of Elections,* 393 U.S. at 572, 89 S.Ct. at 835)). The three-judge court in *Brooks* recognized, as do we, that if a submitting jurisdiction has failed to obtain federal approval of voting changes through one method of preclearance, but has yet to seek preclearance through the other method, permitting holdover is a permissible § 5 remedy.

Short of a complete failure to obtain federal preclearance after an illegal election has taken place, voiding an election and removing elected officials from office has been characterized as "drastic." *See Cook v. Luckett,* 735 F.2d 912, 921–22 (5th Cir.1984); *United States v. City of Houston,* 800 F.Supp. at 505–06; *Lopez v. Hale County,* 797 F.Supp. at 550; *United States v. Louisville Mun. Separate Sch. Dist.,* 557 F.Supp. at 1172. These decisions hold that it is appropriate to void election results when there is evidence that local officials have acted with an invidious purpose, namely, by knowingly holding illegal elections with the intent of discriminating against racial minorities. *Id.* The United States has not plead that the City's and State's failure to properly preclear the City Court annexations was driven by an invidious purpose. The thrust of the United States' pleadings is that the City and State have operated under a fundamental misunderstanding about the requirements of § 5.

Finally, and perhaps most importantly, the United States itself has asked us to permit the City Court judges to holdover in their offices and not void the elections. As we have said, the Attorney General's construction of § 5, which must necessarily include

her understanding of the appropriate remedy for a § 5 violation, is entitled to considerable deference. To be sure, when the United States initially filed its supplemental amended motion for a preliminary injunction, the Justice Department did not suggest that we should permit the "elected" judges to holdover pending judicial preclearance for the City Court annexations. Since then, however, the Justice Department has softened its tone and has not objected to allowing the City Court judges to holdover. We see no need to take the "drastic" step of voiding the City Court elections and removing those judges from office when the United States has not insisted on that remedy and has agreed to the more workable solution of permitting the judges to holdover while the City and State seek judicial preclearance.

### 2. The City's and State's Objections to Injunctive Relief

■ The City and State object to any form of injunctive relief on two grounds. First, they trot out a parade of horribles and contend that permitting the City Court judges to holdover in offices we have declared illegal fatally undermines the legitimacy of the decisions rendered by those judges. Second, the State contends that the United States is guilty of laches because it has asserted since 1994 that the City Court annexations were not precleared, yet the United States, argues the State, waited until after candidate qualifying—which, under Louisiana election law, is after the City Court judges were elected—to seek an injunction. We reject both arguments.

We need not devote much time to the first contention because it has been rejected by

the Supreme Court and at least one other three-judge court. *See Clark v. Roemer*, 500 U.S. at 654, 111 S.Ct. at 2102; *Brooks v. State Bd. of Elections*, 775 F.Supp. at 1482. We repeat: Nothing in our decision today upsets in any way the functioning and authority of the incumbent City Court judges. As to the second objection, we reject it as well because the equitable defense of laches is not available as a matter of law under the facts of this case.[29]

■ "Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *NAACP v. NAACP Legal Defense & Educational Fund, Inc.*, 753 F.2d 131, 137 (D.C.Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). "'The law of laches, like the principle of the limitation of actions, was dictated by experience, and is founded in a salutary policy. The lapse of time carries with it the memory and life of witnesses, the muniments of evidence, and other means of proof.'" *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961) (quoting *Brown v. County of Buena Vista*, 95 U.S. 157, 161, 24 L.Ed. 422 (1877)). In the Fifth Circuit, the defense consists of three elements: (1) a delay on the part of the plaintiff in instituting suit; (2) that is not excused; and (3) that results in undue prejudice to the defendant's ability to present an adequate defense. *National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 708 (5th Cir. 1994).[30]

We must determine as a threshold matter whether the defense of laches is available at all in a suit brought by the United States to

---

**29.** We note that the Louisiana Supreme Court has held that laches is a common-law doctrine that does not apply in Louisiana. *Picone v. Lyons*, 601 So.2d 1375, 1377 (La.1992); *see also* LA.CIV.CODE ANN. art. 3457 ("There is no prescription except that established by legislation.").

**30.** We note in passing that it is not altogether clear whether this particular three-part inquiry applies to suits brought by the government. Some courts have held that "[l]aches bars the assertion of a claim where deferment of action to enforce claimed rights is prolonged and inexcusable and operates to ... [a party's] material prejudice." *See United States v. Lindberg Corp.*,

882 F.2d 1158, 1163 (7th Cir.1989) (internal quotations and citation omitted); *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1091 (7th Cir.1992). The Fifth Circuit has held that laches does not apply unless there is some showing that the government acted fraudulently or in bad faith. *See United States v. Second Nat'l Bank of North Miami*, 502 F.2d 535, 548 (5th Cir.1974). We need not, however, decide which of these tests applies to suits brought by the government because as we discuss below, we hold that the defense of laches does not apply, as a matter of law, under the circumstances of this case.

enforce § 5 of the Voting Rights Act after the Attorney General has interposed a timely objection to voting changes. On this point, we encounter a hotbed of confusion.[31] The defense of laches has been variously described as (1) "logically, and fairly" relevant to a § 5 claim, *Lopez v. Hale County*, 797 F.Supp. at 550; (2) applicable only to requests for injunctive relief on "election eve," *South Carolina v. United States*, 585 F.Supp. at 423; *Charlton County Bd. of Educ. v. United States*, 459 F.Supp. 530, 536 (D.D.C. 1978) (three-judge court); *Wilson v. North Carolina State Bd. of Elections*, 317 F.Supp. at 1303; (3) irrelevant to a § 5 claim, *Henderson v. Graddick*, 641 F.Supp. at 1199–1200; *Dotson v. City of Indianola*, 514 F.Supp. at 399–401; (4) irrelevant to a § 5 claim in the absence of prejudice to the opposing party, *Shuford v. Alabama State Bd. of Educ.*, 920 F.Supp. at 1240; *Fortune v. Kings County Democratic Comm.*, 598 F.Supp. 761, 765 (E.D.N.Y.1984) (three-judge court); and (5) inapplicable to a § 5 claim to the extent the defense amounts to "equitable preclearance," *Brooks v. State Bd. of Elections*, 775 F.Supp. at 1481; *Clark v. Roemer*, 751 F.Supp. 586, 593 n. 43 (M.D.La.1990) (three-judge court), *rev'd on other grounds*, 500 U.S. 646, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991).

Notwithstanding the confusion in this area, it is clear that laches should not be available as a defense if its application would frustrate Congress's purpose in enacting federal legislation. *See United States v. Second Nat'l Bank of North Miami*, 502 F.2d at 548; *Federal Trade Comm'n v. National Business Consultants, Inc.*, 781 F.Supp. 1136, 1153 (E.D.La.1991); *see also Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470–71, 67 L.Ed.2d 685 (1981) (applying the principle to defense of estoppel); *Securities & Exch. Comm'n v. Gulf & Western Indus., Inc.*, 502 F.Supp. 343, 348 (D.D.C.1980) (discussing equitable defense of unclean hands).

We hold that where, as here, the Attorney General has interposed a timely objection to voting changes—well in advance of elections (here, two years)—and the submitting jurisdiction proceeds with elections anyway, the equitable defense of laches is inapplicable in a suit brought by the United States to enjoin implementation of the objected-to changes. A contrary conclusion would frustrate Congress's purpose behind the preclearance procedure embodied in § 5.

As we have pointed out, once the Attorney General timely objects to a voting change, that change is legally unenforceable until the submitting jurisdiction either convinces the Attorney General to change her mind or obtains a declaratory judgment from the District Court for the District of Columbia. *See Morris v. Gressette*, 432 U.S. at 495–96, 502, 97 S.Ct. at 2415–16, 2419. Whether the Attorney General delays in filing suit to enjoin the implementation of administratively uncleared voting changes is therefore irrelevant because the burden of complying with the Voting Rights Act lies with the submitting jurisdiction. *See, e.g., Lopez v. Monterey County*, —— U.S. at —— – ——, 117 S.Ct. at 347–48. Indeed, if we were to hold that the Attorney General, after timely objecting to a voting change two years prior to an election, is barred by laches to seek a § 5 injunction, "[w]e would do violence to the heart of section 5 [by] ... excus[ing] the [submitting jurisdiction's] failure to seek preclearance merely because the [submitting jurisdiction] has been disregarding section 5 for a long time." *Brooks v. State Bd. of Elections*, 775 F.Supp. at 1481; *see also Dotson v. City of Indianola*, 514 F.Supp. at 400–01. The equitable defense of laches is simply anathema to § 5 of the Voting Rights Act when the Attorney General seeks an injunction after interposing a timely objection two years in advance of an election, and the violating jurisdiction nonetheless proceeds with elections. Nothing in the case law counsels a different result.[32]

---

31. We point out that there is a parallel debate over whether and under what circumstances the defense of laches may be asserted in a non-Voting Rights case brought by the government. *See United States v. Administrative Enters., Inc.*, 46 F.3d 670, 673 (7th Cir.1995) (opinion of Pos-

ner, C.J.). We need not weigh in on this debate, however, because we hold that the defense of laches is unavailable, as a matter of law, under the circumstances of this case.

32. *See Lopez v. Monterey County*, —— U.S. at ——, 117 S.Ct. at 347 (holding that district court may

The facts of this case highlight our conclusion. Beginning in 1989, the Attorney General disapproved of the use of the City annexations in the City Court elections. Over the next five years, the City and the State submitted those annexations to the Attorney General for preclearance, culminating in 1994 with the Attorney General's timely objection to the annexations. It was only after administrative preclearance was denied that the State took the position that the City Court annexations were already precleared. Over the course of the next two years, the record shows that the Attorney General, on at least two occasions during the 1996 election year (February 9, 1996 and May 22, 1996), inquired about Louisiana's plans for the City Court elections. Then, on June 26, 1996, the Assistant Attorney General for Louisiana informed the Louisiana Secretary of State that candidate qualifying for the Shreveport City Court elections may proceed using the unprecleared annexations. Approximately six weeks later (August 12, 1996), the Justice Department filed suit seeking to enjoin the City Court elections. Faced with unopposed City Court candidates and, consequently no elections for the City Court, the Justice Department filed an amended motion for a preliminary injunction approximately one month later (September 16, 1996).

The Justice Department plainly did not act in a dilatory manner, and a contrary conclusion would undermine the purpose of administrative preclearance. At the time the Attorney General objected to the City Court annexations (1994), the City Court elections were two years away. Plainly, any attempt to enjoin elections at that time would have been premature. *See, e.g., United States v. City of Houston,* 800 F.Supp. at 508 (declining to order a special election because elections were to be held in "due course"). As we have held, Congress has prescribed two,

and only two, methods of preclearance—administrative preclearance through the Attorney General and judicial preclearance through obtaining a declaratory judgment from the District Court for the District of Columbia. 42 U.S.C. § 1973c. Once the Attorney General interposed a timely objection, the City's and State's only option was to seek judicial preclearance from the District Court for the District of Columbia. *See Morris v. Gressette,* 432 U.S. at 502, 504, 97 S.Ct. at 2419, 2420.

Clearly, if we were to hold that the Attorney General is barred from enjoining the implementation of unprecleared annexations after the Attorney General has timely objected two years prior to the elections, we would in effect be preclearing the City Court annexations by nullifying the Attorney General's objection. And such a nullification would ostensibly mean that the City Court annexations are, via judicial fiat, precleared because the annexations would no longer be deemed violative of federal law. We can imagine no more serious affront to the doctrine of separation of powers than this. Nor does our jurisdictional mandate—to which we have devoted more than enough attention—permit us to preclear the City Court annexations by way of recognizing a defense in a suit seeking injunctive relief. Our jurisdictional mandate is narrow enough, and it certainly does not (and cannot) include the power to preclear the City Court annexations either explicitly or by implication.

## CONCLUSION

We recognize the exacting standards § 5 imposes on those jurisdictions covered by the Voting Rights Act. "[I]f all the provisions of our Constitution," reasoned Justice Black over a quarter-of-a-century ago, "which limit

consider defense of laches on remand, but Attorney General was neither the plaintiff nor had she objected to the voting changes); *Clark v. Roemer,* 500 U.S. at 653, 111 S.Ct. at 2101–02 (commenting that in suit brought by private party, and where Attorney General had earlier interposed an objection, relief should be granted because the plaintiff did not act in a dilatory manner); *Lopez v. Hale County,* 797 F.Supp. at 550 & n. 4 (holding laches barred suit of private party who sought injunction 1½ months after the election);

*Charlton County Bd. of Educ. v. United States,* 459 F.Supp. at 536 (declining to enjoin primary even though Attorney General objected to voting changes approximately one year before; but primary would not have involved voting changes to which the Attorney General had objected); *Wilson v. North Carolina Bd. of Elections,* 317 F.Supp. at 1303 (refusing to enjoin election where private party sought injunction within close proximity to the election date; Attorney General had not interposed an objection).

the power of the Federal Government and reserve other power to the States are to mean anything, they mean at least that the States have power to pass laws and amend their constitutions without first sending their officials hundreds of miles away to beg federal authorities to approve them." *South Carolina v. Katzenbach,* 383 U.S. at 359, 86 S.Ct. at 834 (Black, J., concurring and dissenting). This sentiment has taken on new life in this case because of what the City and State perceive to be serious inroads into the federal-state balance inherent in our Constitution. But these concerns have already been put to rest. *See, e.g., City of Rome v. United States,* 446 U.S. 156, 179–80, 100 S.Ct. 1548, 1562–63, 64 L.Ed.2d 119 (1980) (relying on *South Carolina v. Katzenbach,* 383 U.S. at 308, 325, 86 S.Ct. at 808, 816–17). *Compare Presley,* 502 U.S. at 510, 112 S.Ct. at 832 ("If federalism is to operate as a practical system of governance and not a mere poetic ideal, the States must be allowed both predictability and efficiency in structuring their governments. Constant minor adjustments in the allocation of power among state and local officials serve this elemental purpose.").

Section 5 of the Voting Rights Act stands as an enduring symbol of this Nation's commitment to fairness in our most basic and cherished liberty—the right to vote. Until Congress sees fit to change the Voting Rights Act, we simply are not at liberty to ignore the Act or the Supreme Court's consistent interpretation of it. Today we affirm the vitality of § 5 and hold that the annexations affecting the Shreveport City Court elections are covered "changes" within the meaning of § 5, that those changes were not precleared, and that the results of the City Court elections for Districts A and B cannot be implemented until judicial preclearance is obtained for the City Court annexations.

## DISPOSITION

IT IS ORDERED AND ADJUDGED that

The City's Motion to Dismiss for lack of subject matter jurisdiction is DENIED.

The City's Motion to Dismiss for failure to state a claim upon which relief could be granted is DENIED.

The City's Motion to Compel Discovery is DENIED as moot.

The United States' Amended Motion for a Preliminary Injunction is GRANTED.

The State of Louisiana, the City of Shreveport, the Shreveport City Court, the individual defendants, and other officers, agents, servants, employees, attorneys, and all others in active concert or participation with defendants are hereby:

(A) ENJOINED from further administering or implementing any changes to the voting process concerning the election of Shreveport City Court judicial positions to the extent that such implementation or administration includes unprecleared annexations to the Shreveport City Court boundaries and electorate to which the Attorney General has interposed a timely objection;

(B) ENJOINED from certifying the 1996 Shreveport City Court Division A and B election results, issuing commissions to the successful candidates, and swearing in those candidates to begin six-year terms of office starting January 1, 1997;

(C) ENJOINED from administering, or attempting to administer, any Shreveport City Court election that includes the unprecleared annexations to the Shreveport City Court boundaries and electorate to which the Attorney General has interposed a timely objection, unless and until preclearance is obtained pursuant to Section 5 of the Voting Rights Act;

(D) ORDERED within 45 days of the filing of the Order in this case (December 20, 1996) to file a declaratory judgment action in the United States District Court for the District of Columbia seeking judicial preclearance for the 300-plus annexations that have not received Section 5 administrative preclearance from the Attorney General; and

(E) ORDERED that the incumbent judges in Districts A and B holdover in office and exercise the same authority and capacity they would have enjoyed had preclearance been obtained. This holdover authority shall continue until judicial preclearance for the

annexations is obtained as described in the previous paragraph.

IT IS SO ORDERED.